**AFFIRMED and Opinion Filed July 29, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-00375-CR**

**JUAN ALBERTO SALAZAR MEZA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-82319-2022**

## OPINION

Before Justices Reichek, Goldstein, and Garcia
Opinion by Justice Goldstein

Juan Alberto Salazar Meza appeals his continuous sexual abuse of a child conviction. A jury convicted appellant and sentenced him to fifty years' confinement. In two issues, appellant argues the trial court erred in failing to submit a lesser-included offense instruction to the jury, and the evidence is legally insufficient to support his conviction. We affirm the trial court's judgment.

# BACKGROUND

In June 2022, appellant was charged by indictment with continuous sexual assault of C.V., a child younger than fourteen, on or about the first day of November 2021 through the seventeenth day of March 2022.

At trial in March 2023, C.V. testified she was twelve years old at the time of trial, and she lived in an apartment in Plano with her mother, nine-year-old sister, I.V., and her younger brother. When C.V. first met appellant, she thought he was her "mom's friend," but she also thought appellant and her mother were "dating" because he would "stay over" at their apartment sometimes. C.V. thought appellant was "cool" because he helped her with her homework, cooked food, and took C.V. and her sister and brother for ice cream. At that time, C.V.'s mother worked two jobs, and appellant usually came over on Thursdays at approximately 4:00 p.m. when C.V.'s mother left for work. C.V.'s mother usually came home from work at 11:00 p.m., and appellant stayed the night.

C.V. moved to the Plano apartment in "early 2021." Appellant sometimes tickled C.V. and, when C.V. was eleven years old and living in the Plano apartment, appellant was tickling C.V. on her tummy when he "decided to change it up a little" and started "touching [C.V.'s] private" over her clothes. C.V. testified that her "private" was her "front bottom" that girls use to "pee." Appellant moved his hand "up and down," and C.V. felt "very uncomfortable" and "confused as to what

–2–

[appellant] was trying to do." C.V. "moved away," appellant stopped touching her, and "[t]hings just went back to normal, I guess we stopped playing."

In the apartment living room, there were two couches: a "gray couch and a long brown [couch]" arranged in an "L form." On another occasion, C.V.'s sister was playing outside, her brother was asleep on the brown couch, and C.V. and appellant were on the gray couch when appellant touched C.V.'s "front part" with his hand moving "up and down" both "over and under" her clothes. C.V. was wearing loose shorts, and appellant moved his hand up her thigh and under C.V.'s underwear where he "started doing the same movement as he did over the clothes to [C.V.'s] front private." Appellant's fingers went inside C.V.'s "front private part," and it felt "[w]eird but not in a good way and it kind of hurt." Appellant moved his fingers "[i]n and out" of C.V.'s private part for "30 seconds, a minute" and stopped when C.V.'s brother "moved a little bit like he was about to wake up." C.V.'s brother "kind of went back to sleep," and appellant touched C.V. again "in the same way," but this time appellant took C.V.'s hand and "forced [her] to touch" his private part outside his pants.

When asked if there was a time when appellant touched C.V. and himself at the same time, C.V. described an assault that occurred when she was watching YouTube on her laptop in her top bunk bed. Appellant stood on the lower bunk bed and reached up to "put his fingers inside of [C.V.'s] private part." C.V. could tell appellant was also touching himself because C.V. heard appellant's "bracelets

–3–

jingling." C.V. testified there were other times appellant touched her and himself at the same time, but she did not remember the details.

C.V. testified there were also times when appellant put his mouth on her front private part. These assaults happened in C.V.'s bunk bed and "especially in the bedroom" on the queen-sized bed. C.V. described one instance in which appellant climbed up on the top bunk with C.V., pulled C.V.'s shorts and underwear "somewhere down [her] legs," and licked C.V.'s private part. Similar assaults occurred in the queen bed "[m]ore than five times probably" and in C.V.'s bunk bed "more than once, less than five" times.

C.V. remembered one occasion when she was lying on her stomach and watching YouTube on the queen bed. Appellant sat on the bed, lifted C.V. from the hips, pulled down C.V.'s shorts and underwear, took out his private part, and "tried to put it in [C.V.'s] private part." This assault "hurt a lot," and appellant was not able to put his private part in C.V.'s private part. Nevertheless, appellant's private part contacted C.V.'s private part. Appellant "kept trying to, like, put it in" and kept putting C.V. in "that position," but eventually he "gave up."

On more than one occasion in her mother's bedroom, appellant tried unsuccessfully to put his private part in C.V.'s "bottom," which she identified as the part she used for "[p]ooping." C.V. testified appellant's private part contacted her bottom, and he tried to put his private part in the "hole."

–4–

C.V. testified an assault occurred on the brown couch where appellant pulled down her "pants or shorts or whatever [she] was wearing and [her] underwear," took out his private part, and touched himself. C.V. knew he was "messing with his private part" because of "the bracelets." C.V. felt "this warm temperature" in her bottom and, when appellant left to go to the restroom, saw white liquid on her bottom. Appellant "came back in with toilet paper and he wiped off the thing from [her] bottom."

Around February 2022, C.V. told her mother that appellant was touching her, but appellant "lied" when C.V.'s mother talked to him. C.V.'s mother told C.V. "not to tell anyone else about it," and appellant continued to come over on Thursdays. Appellant acted "normal for a little bit" but started "doing things" to C.V. again.

In March 2022, C.V. was called into the counselor's office at school. C.V. did not know, at first, why she was called into the office, but the counselor "mentioned something" about how C.V.'s sister told the counselor "about the things that were going on in the home." C.V. testified she did not "remember everything that [she] told the counselor," but she remembered crying while talking to the counselor and she "believed" she told the counselor what appellant was doing to her. C.V. remembered that, after talking to the counselor, she was taken to "another place" to do an interview.

Catie Daniels, a forensic interviewer at the Collin County Children's Advocacy Center, testified that some of the things an interviewer looks for in a

–5–

forensic interview are general details, sensory details, consistency, chronological order, and "red flags." General details are the "who, what, where, how something happened." Sensory details are "things that you feel, you hear, you see, you taste" and includes "things that you've really experienced." Consistency is present when the interviewer asks a child a question and the child gives the same answer even if the interviewer has asked the question in a different way. Daniels described chronological order as "being able to talk about something from the beginning to the end." "Red flags" are "things in the interview that arise that are questionable" such as an inability to give the interviewer any type of details about the abuse.

Daniels testified she interviewed C.V. in March 2022. C.V. was "able to describe things that amounted to sexual abuse," she used age-appropriate terms, she described the abuse and how it felt in detail, and she demonstrated "the position that she would have to get in or that [appellant] would want her to be in" over the queen bed during the abuse. During the interview, C.V. "talked about how her sister was also aware of the situation" and knew her sister had told the counselor in the beginning of the week which led to C.V.'s outcry to the counselor and the forensic interview that followed. Specifically, C.V. "talked about how her sister had witnessed seeing them under the blankets, the [appellant] and [C.V.], at times." As Daniels "talked through all of these things with [C.V.]," C.V. was able to remain consistent in discussing the instances of abuse and gave chronological details and sensory details.

C.V.'s sister, I.V., testified she initially liked appellant but stopped liking him when she sometimes noticed that C.V. "had a blanket and [appellant] put, like, his hand under the blanket." I.V. did not know what was happening, and she asked C.V. what was happening. At first, C.V. did not say what was happening, but the second time I.V. asked C.V. told her "the truth." C.V. told I.V. that appellant "used to like touch her on her privates while he put his hand under the blanket." One day at school, a counselor came and gave a lesson about "nobody touch you on your parts." That same day, I.V. told her teacher what was happening. I.V. was "scared that they would be mad at [her] for telling [her] teacher." At the conclusion of the evidence, the jury found appellant guilty of continuous sexual assault of a child. This appeal followed.

## DISCUSSION

In his first issue, appellant complains the trial court erred in denying his request to submit a jury instruction for the lesser-included offense of indecency with a child by touching.

At the charge conference, appellant's counsel requested "a lesser-included offense of fondling." Counsel continued, "if the jury were to conclude that obviously he did not commit this more than one time, then, again, there has been testimony that the jury could conclude that the hands under the blanket can be some form of fondling." The prosecutor responded:

I think I would -- obviously if we're going to put a lesser in the charge we would need more specificity as to which lesser. Are you asking for aggravated sexual assault by penetration of her vagina with his hand or are you asking for indecency with a child by his hand contacting her vagina? Just putting a lesser of fondling I don't think is something we can do.

Defense counsel answered that he had "no objections to the touching with the hand of the vagina or -- they talked about the touching of the breast, there was breast contact touching." The prosecutor countered that "that wouldn't be a lesser-included because it's not part of the continuous offense." The trial court took the discussion off the record. Back on the record, the trial court stated that both the State and the defense had the proposed charge of the court. The trial court asked if either party had "any objections, or requests for instructions to the charge" and both the State and the defense stated they had no objections.

Appellant did not request a jury instruction for the lesser-included offense of indecency with a child by touching. *See* TEX. R. APP. P. 33.1(a) (requiring a timely request, objection, or motion to preserve a complaint for appellate review). Appellant initially requested "a lesser-included offense of fondling" but after an off-the-record discussion, affirmed that there were no objections or requests that instructions be added to the charge following the charge conference. Unrequested defensive instructions are still subject to ordinary rules of procedural default. *Williams v. State*, 662 S.W.3d 452, 461 (Tex. Crim. App. 2021). A defendant cannot complain for the first time on appeal about the lack of a defensive instruction absent preservation of the error. *Id.* Moreover, specific to requests for lesser-included

–8–

offenses, the defendant must point to evidence in the record that raises the lesser-included offense. *Id.* On this record we conclude appellant failed to preserve this issue for our review. *See id.* We overrule appellant's first issue.

In his second issue, appellant challenges the sufficiency of the evidence to show that he committed multiple instances of sexual abuse against C.V. over a period of more than thirty days.[1]

The indictment charging appellant with continuous sexual abuse of a child under 14, citing penal code section 21.02(b), alleged the abuse occurred "on or about the 1st day of November, 2021 through the 17th day of March 2022" under Count I, aggravated sexual assault of a child, and alleged appellant, "during a period that was 30 days or more in duration, committed two or more acts of sexual abuse against [C.V.]" and alleged four types of acts.[2] The indictment tracks the elements of an offense of continuous sexual assault of a young child under section 21.02 of the penal code. *See* TEX. PENAL CODE § 21.02(b)(1).[3] Appellant contends that C.V.

---

[1] Appellant incorrectly states that he was indicted under section 22.01 of the penal code, "which requires proof that two acts of sexual abuse occurred over a period of more than 30 days," then argues the evidence was legally insufficient under section 21.02 of the penal code. We discern the first penal code reference was an inadvertent error and proceed with an analysis under section 21.02.

[2] Count II of the indictment charged appellant with indecency with a child.

[3] (b) A person commits an offense if:

(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

(2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is:

(A) a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense; or

made a "clear allegation that an act of abuse occurred in 2021," but there were not sufficient allegations to show that any other incident occurred more than thirty days after the first incident. In making this argument, appellant complains that evidence of other incidents of abuse only alleged "'something' happening." This is the entirety of appellant's argument, and it is not supported by the record.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

In conducting a sufficiency review, we consider all of the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard is deferential

---

(B) a disabled individual.

TEX. PENAL CODE § 21.02(b).

and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Thus, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

The evidence need not directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt, and circumstantial evidence, alone, can be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the defendant's conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we treat direct and circumstantial evidence equally, and we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

A person commits the offense of continuous sexual abuse of a young child if (1) during a period that is thirty or more days in duration, he commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims and (2) at the time of the commission of each act of sexual abuse, the actor is seventeen years of age or older and the victim is a child younger than fourteen years of age, regardless of whether the actor knows the age of the victim at the time the offense is committed. TEX. PENAL CODE § 21.02(b). "[A]ct of sexual abuse" means an act that violates one or more enumerated penal laws of section 21.02(c), which includes the offenses of aggravated sexual assault of a child and indecency with a child by contact. *Id.* § 21.02(c)(2), (4); *see also id.* §§ 21.11(a)(1), 22.021. Here, the indictment alleged appellant committed two or more acts of sexual abuse against C.V. during a period of thirty or more days in duration, to-wit: the offenses of aggravated sexual assault of a child and indecency with a child by contact. *See id.* § 21.02(b).

The Texas Court of Criminal Appeals has for decades recognized that child victims cannot be expected to testify with the same clarity and ability that is expected of mature and capable adults. *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990). Therefore, "[t]he legislature created the offense of continuous sexual abuse of a child in response to a need to address sexual assaults against young children who are normally unable to identify the exact dates of the offenses when there are ongoing acts of sexual abuse." *Michell v. State*, 381 S.W.3d 554, 561 (Tex.

–12–

App.—Eastland 2012, no pet.); *see also Williams v. State*, 305 S.W.3d 886, 890 n.7 (Tex. App.—Texarkana 2010, no pet.) (citing *Dixon v. State*, 201 S.W.3d 731, 737 (Tex. Crim. App. 2006) (Cochran, J., concurring)).

The testimony of a child victim alone is sufficient to support a conviction for continuous sexual abuse of a child. *Garner v. State*, 523 S.W.3d 266, 271 (Tex. App.—Dallas 2017, no pet.); see *also* TEX. CODE CRIM. PROC. art. 38.07; *Villalon*, 791 S.W.2d at 134. Furthermore, corroboration of the victim's testimony by medical or physical evidence is not required. *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.); *see also Cantu v. State*, 366 S.W.3d 771, 775–76 (Tex. App.—Amarillo 2012, no pet.); *Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). Thus, C.V.'s testimony, without more, can be sufficient to support a conviction for continuous sexual abuse of a child. *See Garner*, 523 S.W.3d at 271.

"[A]lthough the exact dates of the [sexual] abuse need not be proven, the offense of continuous sexual abuse of a child does require proof that there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration." *Michell*, 381 S.W.3d at 561; *see also Smith v. State*, 340 S.W.3d 41, 48 (Tex. App.—Houston [1st. Dist.] 2011, no pet.). The jury was charged to determine whether the abuse occurred "during a period that was 30 days or more in duration." *See* TEX. PENAL CODE § 21.02(b)(1). Here, appellant challenges only the sufficiency of the evidence to support the duration element of the offense: he

–13–

contends that C.V.'s testimony does not provide sufficient evidence for the jury to reasonably infer that the sexually abusive acts he allegedly committed against her occurred over a period of more than thirty days.

"Speculation is mere theorizing or guessing about the possible meaning of the facts and evidence presented." *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (quoting *Hooper*, 214 S.W.3d at 16). Conversely, "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. (quoting *Hooper*, 214 S.W.3d at 16). "Juries are permitted to draw multiple reasonable inferences from the evidence as long as each inference is supported by the evidence presented at trial[.]" *Id*. (citing *Hooper*, 214 S.W.3d at 15).

Although not cited by appellant, three cases from the Eastland court of appeals addressed circumstances in which, although the child victims could not recall specific dates that the alleged abuses occurred, that court affirmed the convictions based on other benchmarks in the victim's testimony that permitted the jury to infer that the acts of sexual abuse spanned a period of thirty days or longer. *See Wishert v. State*, 654 S.W.3d 317, 329 (Tex. App.—Eastland 2022, pet. ref'd); *Soto v. State*, No. 11-19-00214-CR, 2021 WL 3235881, *5 (Tex. App.—Eastland July 30, 2021, no pet.) (mem. op., not designated for publication); *Michell*, 381 S.W.3d 554. These benchmarks included the various addresses where the child victims lived when the different abuses occurred, the sheer number of abuses, and testimony from the

victims about their ages when the acts of sexual abuse occurred. *See Soto*, 2021 WL 3235881, at *4–5; *Michell*, 381 S.W.3d at 561. Finding this persuasive authority applicable in the instant case, we proceed with an analysis of the benchmarks present here.

C.V. testified she moved to the Plano apartment in "early 2021," and appellant contends in his argument that C.V. made a "clear allegation that an act of abuse occurred in 2021."[4] Appellant sometimes tickled C.V. and, when C.V. was eleven years old and living in the Plano apartment, appellant was tickling C.V. on her tummy when he started "touching [C.V.'s] private" over her clothes. Appellant usually came over on Thursdays at approximately 4:00 p.m. when C.V.'s mother left for work. C.V.'s mother usually came home from work at 11:00 p.m., and appellant stayed the night.

On another occasion, C.V.'s sister was playing outside, her brother was asleep on the brown couch, and C.V. and appellant were on the gray couch when appellant touched C.V.'s "front part" with his hand moving "up and down" both "over and under" her clothes. Appellant moved his fingers "[i]n and out" of C.V.'s private part for "30 seconds, a minute" and stopped when C.V.'s brother "moved a little bit like he was about to wake up." C.V.'s brother "kind of went back to sleep," and appellant

---

[4] Appellant appears not to dispute one clear allegation of abuse in 2021 but avers there were not sufficient allegations to show that any other incident occurred more than thirty days after the first incident.

touched C.V. again "in the same way," but this time appellant took C.V.'s hand and "forced [her] to touch" his private part outside his pants.

C.V. testified about another incident that occurred in her top bunk bed. Appellant stood on the lower bunk bed and reached up to "put his fingers inside of [C.V.'s] private part." C.V. could tell appellant was also touching himself because C.V. heard appellant's "bracelets jingling." C.V. testified there were other times appellant touched her and himself at the same time, but she did not remember the details.

C.V. testified there were also times when appellant put his mouth on her front private part. These assaults happened in C.V.'s bunk bed and "especially in the bedroom" on a queen-sized bed. C.V. described an incident in which appellant climbed up on the top bunk with C.V., pulled C.V.'s shorts and underwear down "somewhere down [her] legs," and licked C.V.'s private part. Similar assaults occurred in the queen bed "[m]ore than five times probably" and in C.V.'s bunk bed "more than once, less than five" times.

C.V. testified about an incident that occurred when she was lying on her stomach and watching YouTube on the queen bed. Appellant sat on the bed, lifted C.V. from the hips, pulled down C.V.'s shorts and underwear, took out his private part, and "tried to put it in [C.V.'s] private part." This assault "hurt a lot," and appellant was not able to put his private part in C.V.'s private part. Nevertheless,

–16–

appellant's private part contacted C.V.'s private part.  Appellant "kept trying to, like, put it in" and kept putting C.V. in "that position," but eventually he "gave up."

On more than one occasion in her mother's bedroom, appellant tried unsuccessfully to put his private part in C.V.'s "bottom," which she identified as the part she used for "[p]ooping."  C.V. testified appellant's private part contacted her bottom and he tried to put his private part in the "hole."

C.V. testified an incident occurred on the brown couch where appellant pulled down her "pants or shorts or whatever [she] was wearing and [her] underwear," took out his private part, and touched himself.  C.V. knew he was "messing with his private part" because of "the bracelets."  C.V. felt "this warm temperature" in her bottom and, when appellant left to go to the restroom, saw white liquid on her bottom.  Appellant "came back in with toilet paper and he wiped off the thing from [her] bottom."

Around February 2022, C.V. told her mother that appellant was touching her, but appellant "lied" when C.V.'s mother talked to him.  C.V.'s mother told C.V. "not to tell anyone else about it," and appellant continued to come over on Thursdays. Appellant acted "normal for a little bit" but started "doing things" to C.V. again.  In March 2022, I.V. told her teacher about the abuse, and C.V. made an outcry to a school counselor.  C.V. testified that the "last time something happened" with appellant was the Thursday before the day she spoke to the counselor.

Consistent with the applicable standard of review, we have reviewed the evidence in the light most favorable to the jury's verdict. C.V.'s testimony encompassed multiple acts of sexual abuse that commenced early in 2021 and continued until at least February 2022 when she told her mom that appellant "was touching me" with the last time "something happened" being the Thursday before she spoke to the counselor in March of 2022. C.V.'s testimony further provided that appellant was there only on Thursdays when her mom left for work.[5] C.V. testified to multiple specific acts of sexual abuse, involving multiple orifices, occurring in multiple locations in the apartment. At a minimum, C.V. testified appellant put his fingers in C.V.'s private part on the gray couch and in C.V.'s top bunk bed; touched C.V.'s private part and his private part "other times"; put his mouth on C.V.'s private part more than five times; tried to put his private part in C.V.'s private part on the queen bed; and more than once tried to put his private part in C.V.'s bottom. Further, her "abuse" timeline was at least partially corroborated by other testimony, including that of I.V. Considered as a whole, the cumulative force of the evidence was sufficient to support the jury's finding that appellant's repeated acts of sexual abuse against C.V. occurred during a period of thirty days or more in duration,

---

[5] The record is clear that Thursday was the only day appellant was alone at the apartment with C.V. and her siblings and the only day of the week that the abuse occurred. The jury was permitted to draw multiple reasonable inferences from the evidence of the abuse occurring only on Thursdays and the sheer number of assaults, as long as each inference was supported by the evidence presented at trial. The record reflects testimony of at least six different, specific types of sexual assaults; only on one occasion did it appear that two types of assault occurred on the same date. From this evidence, the jury could deduce the logical consequence that the assaults occurred over more than thirty days.

–18–

commencing in 2021 and concluding in February or March of 2022. As such, we conclude the record before us contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that appellant was guilty of the offense of continuous sexual abuse of a young child as charged in the indictment. *See Jackson*, 443 U.S. at 326; *Wishert*, 654 S.W.3d at 329. Accordingly, we overrule appellant's second issue.

We affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

Publish
TEX. R. APP. P. 47.2(b)
230375F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

JUAN ALBERTO SALAZAR
MEZA, Appellant

No. 05-23-00375-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 219-82319-
2022.
Opinion delivered by Justice
Goldstein. Justices Reichek and
Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.


Judgment entered this 29th day of July 2024.